Opinion issued October 26, 2006 


















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-06-00292-CV
__________
 
ZENOBIA TOLIVER, MONTRAVIAN MARTIN, AND MARCUS
HOLLOWAY, Appellants
 
V.
 
TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellee
 

 
 
On Appeal from the 306th District Court
Galveston County, Texas
Trial Court Cause No. 04CP0106
 

 

O P I N I O N
          In this accelerated appeal,


 appellants, Zenobia Toliver, Montravian Martin,
and Marcus Holloway, challenge the trial court’s order, entered after a bench trial,
terminating their parental rights to their respective minor children, D.H., Z.M., and
A.R.


 In six issues, Toliver contends that the evidence is legally and factually
insufficient to support the trial court’s findings that she engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endangered the physical or emotional well-being of the children;


 she failed to
support the children in accordance with her ability during a period of one year ending
within six months of the filing of the petition;


 she constructively abandoned the
children, who had been in the temporary managing conservatorship of the Department
of Family and Protective Services (“DFPS”) for not less than six months;


 she failed
to comply with the provisions of a court order that specifically established the actions
necessary for her to obtain the return of her children;


 she used a controlled substance
in a manner that endangered the health and safety of her children and failed to
complete a court-ordered substance abuse treatment program;


 and the termination of
the parent-child relationship between Toliver and her children was in the children’s
best interest.


 
          In two issues, Martin contends that the evidence is legally and factually
insufficient to support the trial court’s findings that termination of the parent-child
relationship between Martin and Z.M. was in Z.M.’s best interest


 and that the trial
court erred in terminating his parental rights to Z.M. on the basis that he did not
timely file an admission of paternity.


 
          In three issues, Holloway contends that the evidence is legally and factually
insufficient to support the trial court’s findings that “he engaged in any conduct or
knowingly placed or allowed [D.H.] to remain in conditions or surroundings which
endangered the physical or well-being of [D.H.],”


 he “had his parent-child
relationship terminated with respect to another child based on findings that the
parent’s conduct was in violation of Paragraph (D) or (E) . . .,”


 and termination of
the parent-child relationship between Holloway and D.H. was in D.H.’s best
interest.


 
          We affirm the order in part and reverse and remand in part.
Factual and Procedural Background
          Katy Leacroy, the DFPS case worker originally assigned to the case, testified
that, at the time of trial, D.H. was ten-years old, Z.M. was eight-years old, and A.R.
was four-years old. Leacroy stated that D.H. suffers from osteogenesis imperfecta,
also known as “brittle bone,” is confined to a wheelchair, and has fragile bones
subject to being easily broken. 
Toliver
          Leacroy began working with Toliver in July 2003 because of allegations of
medical neglect, narcotics use, and “domestic disturbances between [Toliver] and
boyfriends.” DFPS received “several reports . . . that [Toliver] was . . . snorting
cocaine,” and Leacroy learned of an allegation that after D.H. had broken his legs at
school, he “wasn’t taken to the hospital immediately.” DFPS requested that Toliver
undergo narcotics testing and take parenting classes. Toliver initially stated that she
did not need parenting classes, denied narcotics use, and refused substance abuse
services. During the year before DFPS sought custody of the children, Toliver “failed
to submit urine samples on several occasions.” Toliver subsequently agreed to a drug
and alcohol evaluation only after DFPS decided “to pursue court action.”  
          DFPS introduced into evidence Toliver’s records from “Turning Point,” a
substance abuse treatment program. These records reflect that counselors had made
home-based visits to conduct random narcotics tests on February 20, 2004 and March
12, 2004 and that Toliver refused those tests, stating that “if she never submitted a
urinalyses she would never be submitting a positive sample.” On March 29, 2004,
during another home-based visit, although Toliver was not home, the counselor was
told that Toliver “continues to use mood altering chemicals and comes and goes
regularly.” Counselors made home visits on May 18, 2004, May 28, 2004, and June
28, 2004, and Toliver was not home or did not answer the door. Counselors left notes
requesting Toliver to contact Turning Point. On July 28, 2004, a counselor called
DFPS and obtained a new address for Toliver in Galveston. When Toliver was
finally tested in August 2004, she tested positive for cocaine on August 17, 23, 27,
and 30.
          On September 21, 2004, Toliver and Holloway agreed to a mediated settlement
agreement with DFPS, which was incorporated into a court order, wherein DFPS was
named managing conservator of the children, Toliver was ordered to pay child
support in the amount of $40 per month for Z.M. and A.R., and Holloway was
ordered to pay child support in the amount of $100 per month for D.H. The mediated
settlement agreement required Toliver to follow all recommendations made as a result
of a narcotics evaluation, and Toliver was specifically ordered to take a urinalysis
“today” and to “go inpatient” if the results were positive. The agreement admonished
Toliver that a “failure to comply with the terms and conditions of this agreement”
could result “in additional orders” and that Toliver’s parental rights could “be
restricted or terminated” if she was unable to provide the children with a safe
environment. On October 14, 2004, the trial court again ordered Toliver to take a
urinalysis and to submit to inpatient treatment if her results were positive or attend
substance abuse meetings “seven days a week” if her results were negative. 
          On cross-examination, Leacroy agreed that Toliver was not present at school
when D.H. broke his legs. She acknowledged that Toliver had “completed parenting”
classes. Leacroy also agreed that she not an active participant in the case after the
mediation. Leacroy conceded that DFPS’s removal of the children from Toliver’s
home was not based on any actions by Martin and that DFPS had not requested any
services of Martin.
          Sheri Brewster, the DFPS case worker for the children since October 2004,
testified concerning Toliver’s records from the ADA Women’s Center, an inpatient
drug treatment facility. These records, which were admitted into evidence, reflected
that Toliver was admitted to inpatient treatment at ADA on November 22, 2004, but
was quickly discharged on November 29, 2004. Brewster stated that inpatient
treatment lasts normally “27 to 30 days minimum.” The ADA records include the
following comments regarding Toliver’s treatment:
          After it was reported that client made verbal threat towards
another client, first towards client and then repeated this threat to two
different staff persons, client was discharged for noncompliance after
review of this incident along with client’s negative and hostile
behaviors. Client has not been focused on treatment objectives and had
made it clear she was in treatment for [Child Protective Services
(“CPS”)] only.
 
          DFPS entered into evidence a February 11, 2005 permanency plan and
permanency progress report, which states that Toliver had not been visiting her
children on a regular basis because she was “too busy.” The report further states that
“due to tension” between Toliver and the relative with whom the children were placed
after DFPS was named managing conservator, any future visits would have to be
scheduled at the DFPS office. Finally, the report reflects that at a prior permanency
plan meeting, Toliver had become “extremely angry and began shouting profanity
repetitively at the care giver” and that Toliver “had to be escorted out of the building
by security.”
          The trial court, in a February 17, 2005 permanency hearing order, again
ordered Toliver to “go today and take [urinalysis]” and also “to get anger
management counseling” and to attend “Women’s Resource Crisis Center victim
classes.” 
          DFPS introduced into evidence a May 12, 2005 permanency plan and
permanency progress report, which summarizes Toliver’s substance abuse and
treatment history. The report states, 
          Toliver went to inpatient at ADA House for 10 days, was
discharged for fighting in the facility without successful completion. A
new program was located and when the bed became available [Toliver]
stated she was working and was unable to go inpatient but would
attempt to go outpatient treatment. As of the end of January [Toliver]
began participating in intensive outpatient treatment through the Gulf
Coast Center program. As of the end of April Toliver was discharged
and recommendations were made for inpatient treatment as she tested
positive for cocaine on 3/9/05, 3/30/05 at both Turning Point and Gulf
Coast and on 4/20/05. Ms. Toliver refused to go to inpatient . . . .
 
          Ms. Toliver had a visit on March 25, 2005 with her children
where she was extremely anxious and agitated as well as highly
emotional. Brewster . . . had to warn Toliver to calm down or the visit
would be terminated. Toliver appeared to the workers to have been
high. Toliver tested positive for cocaine five days later.
 
          Toliver has completed her psychological evaluation. . . . However
with her current lack of interest, failure to accept responsibility,
defensiveness and hostility she is quite unlikely to participate in or
benefit from these services. . . . Toliver may participate in services to
the extent that she is required in order to regain custody of her children,
but it is unlikely that she will make significant changes. . . . [l]ong term
monitoring of her parenting is recommended if she regains custody of
her children.
 
          Toliver has begun counseling and has been extremely
inappropriate and aggressive with counselor during at least one session.
The counselor . . . had feared she could become violent during the
exchange. 
 
          Toliver has also been attending anger management classes. The
worker spoke with the counselor and was told that Toliver has [been]
disruptive . . . and will not be getting a certificate of completion. . . . 
The counselor stated that although Toliver has the tools to control
herself that it will be unlikely that she will ever utilize them due to her
personality.
 
The report further reflects that security guards at the building where Toliver attended
classes “reported numerous problems” with Toliver. The report concludes that
“progress has not been made as Toliver continues to use drugs and test positive for
cocaine” and that “Toliver is still unable to maintain a safe and stable home for the
children.” 
          DFPS introduced into evidence a May 27, 2005 permanency hearing order,
which states that Toliver had “not demonstrated adequate and appropriate compliance
with the service plan.” The court again ordered Toliver “to go inpatient.” The court
stated that if Toliver went to inpatient treatment, it would grant an extension, but that
if Toliver did “not successfully complete rehab,” her case would “go to termination.” 
Brewster stated that after this order was signed, Toliver did go to and complete an
inpatient program, and that the case was extended as a result. 
          DFPS, pursuant to a business records affidavit, then introduced Gulf Coast
Center (“GCC”) records, which reflect that Toliver received follow-up outpatient
treatment at GCC beginning in late July 2005 after completing inpatient treatment at
a facility in Brazosport. Toliver’s “client profile” states, “Presenting problem. Client
has been in treatment at [GCC] outpatient but recently tested positive for cocaine and
reports daily use of alcohol.” An assessment summary reflects that Toliver had
reported that she was living with her sister who was “spending her SSI and food
stamps on crack/powder cocaine,” and Toliver had also stated that “all her family
does drugs.” A GCC progress report states that “client progress stalled,” that Toliver
tested positive for cocaine and PCP on August 8 and 11, 2005, and that Toliver had
“relapsed on cocaine.” A progress note dated August 18, 2005, states that Toliver
“became hostile” when asked to discuss how her choices prompted DFPS
involvement, that Toliver appeared “unwilling to work on her accountability and
continues to blame others for her circumstances,” and that Toliver “refuses to talk
about the difficulty of staying clean and sober despite the dire outcome of her
continued use.” An August 24, 2005 report states that Toliver “was unable to
complete this group” and that Toliver “became combative, threatening and cruel in
an angry outburst” and was asked to leave the building and not return. An August 24,
2005 progress note states that Toliver “continues to present a threat to group safety.” 
         On August 31, 2005, representatives from GCC and DFPS held a “crisis team
intervention” with Toliver. A report from this crisis intervention states that Toliver’s
“progress has stalled,” that “other options for treatment were explored due to
[Toliver’s] positive [urinalysis],” but that Toliver “reported she would not return to
residential treatment nor did she want GCC services.” Toliver also “reported she was
moving to Houston tonight and would be seeking services in Houston,” and a “CPS
rep informed client that she was not given permission to leave treatment and that
treatment . . . must be pursued wherever client chose to move.” The final GCC report
concludes that Toliver “refuses to own her use of PCP and appeared irritated and
indignant at being drug tested.” Toliver, then discharged from GCC, never contacted
Brewster again, although Brewster stated that Toliver knew how to get in touch with
her. Brewster further stated that Toliver’s last contact with her children was in March
2005, and that it had been “basically a year” since Toliver had seen her children.


 
Toliver also never paid child support. 
          DFPS then introduced evidence that Toliver had been charged with
misdemeanor assault on May 26, 2005 and was placed on community supervision. 
Brewster testified that Toliver had endangered her children by using narcotics and
engaging in criminal activity, that Toliver did not support the children as ordered
during the pendency of the case, and that Toliver had not maintained significant
contacts with her children. 
          At the time of trial, DFPS had placed D.H. in a therapeutic foster home and
placed Z.M. and A.R. together in another foster home. The children visited each
other regularly and were “doing extremely well.” D.H. bonded with his foster parents
and Z.M. and A.R. bonded with D.H.’s foster parents. D.H.’s foster parents intended
to adopt D.H. and A.R., and DFPS would place Z.M. in the same home as her siblings
to give Z.M. time to adjust and to give the foster family the opportunity to address
Z.M.’s behavioral problems. Brewster reported that Z.M. “has rages,” and she noted
that D.H.’s foster family is “primarily a medical needs home so they don’t want to
risk [Z.M.] injuring any of the children in the home.” However, the foster family was
“willing to have [Z.M.] as a foster child to keep all three together to see if they are
able to adopt all three.” 
          Brewster further testified that she was not aware that D.H.’s grandmother,
Shirley Joseph, was a possible placement until trial, that at a December 2005 hearing,
the trial court ordered that Joseph could have a supervised visit with D.H., and that
the visit occurred. However, Joseph had not contacted Brewster since the visit, and
DFPS still sought termination based on the facts that D.H. has special needs, he has
bounced between family members his whole life, he is in a therapeutic home that
cares for him, and he is starting to get specialized treatment for his brittle bone
condition for the first time in his life from Texas Children’s Hospital (“TCH”). 
Although Brewster expressed concerns about D.H.’s safety in Joseph’s home, she was
not opposed to Joseph continuing to see D.H. after termination.  
          On cross-examination, Brewster agreed that Toliver completed a psychological
evaluation and an anger management course and that she went to counseling. 
Brewster also agreed that, if Holloway and Toliver were never married, Holloway
would not have had any right to take D.H. away from Toliver. Brewster agreed that,
at the present time, no one was willing to adopt Z.M.
          Stacy Faught, D.H.’s foster mother, testified that D.H. had been living in her
home since January 2005, that her home is termed a “habilitative primary medical
needs foster home,” that she had a lot of experience in dealing with special needs
children, that she received special medical training in caring for D.H., and that she
and her husband wanted to adopt D.H. and A.R. In regard to Z.M., Faught was not
sure as to whether her family could meet both D.H.’s and Z.M.’s needs because
Z.M.’s needs were more “therapeutic.” Faught explained that it was potentially
unsafe for Z.M. to be around D.H. due to D.H.’s brittle bone condition because Z.M.
had “outbursts” and you could not tell when she would “get mad and hit.” D.H. was
currently on two types of medications, was receiving bone fusion treatment at TCH,
and had not been receiving this fusion treatment prior to being placed with Faught. 
At the time of trial, D.H. saw his sisters, on average, once a month, but sometimes
several times a month. Faught also stated that multiple therapists visit their home and
that she receives help from many others in caring for her foster children on a daily
basis. Faught and her husband had bonded with D.H., her husband and D.H. were
“very close,” and D.H. was involved in a special baseball league.
          Toliver testified that she went to treatment for thirty days, attended anger
management classes, “did victim awareness,” and “did a parent class.” She had
received counseling, but after she moved to Houston, she had not done anything else. 
Toliver moved to Houston five months before trial and got an apartment and a job. 
Toliver admitted that she had a narcotics problem and stated that the last time she
used narcotics was when she left treatment in Galveston. Toliver explained that she
still needed time to get herself together and to “make sure she [could] stay clean,” so
she wanted her kids to be placed with a family member, namely Joseph.  
          Toliver had received special training to care for D.H., and, prior to DFPS
taking custody, she had been D.H.’s primary care giver, except for times when his
“daddy came and got him once in a while.” Toliver last contacted DFPS in October
2005 to provide her new address and had not seen her children since Easter in 2005. 
Toliver stated that she was currently employed at Sonic, that her rent was cheap, and
that she had a one-bedroom apartment. The last time that Toliver took a drug test was
in August 2005.
          Joseph testified that she is D.H.’s grandmother, that she was present at D.H.’s
birth, that she has received training to care for D.H., and that D.H. knows Joseph is
his grandmother. She first became aware that D.H. was in a foster home when she
attended a hearing in December 2005, and it was her understanding that she would
“have visits” and that DFPS was going to conduct a home study on her house. 
However, DFPS never performed the home study. She had one visit with D.H. since
December, and although she wanted another visit, she did not ask for one and no one
explained to her how the next visit would take place. Joseph had visited with Z.M.
and A.R., she thought it was a “wonderful idea” for her to be managing conservator
for all three children, and she was willing to undergo more training to care for D.H. 
          On cross-examination, Joseph admitted that she is currently paying her bills
with help from the county. Although she has only one bedroom, she stated that she
could move to a bigger place with help from the county. Joseph, who was separated
from her husband, was not currently working due to a tail bone injury, but intended
to return to work. When asked who would take care of the children when she
returned to work, Joseph stated that she would try to put them in child care, but also
stated that she “would probably be at home with [D.H] so he would be protected since
he has brittle bones.” She would still work, but would “fix it where when [the
children] go to school [she] would be at work.” When asked if she could take off
work and drive D.H. to TCH in Houston for bone fusion treatment, she stated that she
“probably couldn’t at this present time,” but thought she might get some help from
the county. Joseph stated that other family members had also offered to help care for
the children and provide financial support. Joseph conceded that both of her
daughters had their children removed by DFPS, that she had offered her home to
those children, and that she did not pass a DFPS home study. Joseph conceded that
her daughters would not help her care for the children.
          Jarvis Thomas, Holloway’s father, testified that he had offered to help Joseph
with the children and that he could lift D.H. for transportation purposes. Thomas,
who was not currently employed due to medical problems, stated that he lived in
Houston. He contended that when he returned to work, he could work around his
schedule to transport D.H. to Houston for his treatments.
 
Holloway
          DFPS introduced evidence that Holloway had been convicted of robbery and
sentenced for a period of two years. Brewster testified that since October 2004,
Holloway had not visited D.H. and had never called to request a visit. Brewster
explained that Holloway had constructively abandoned D.H. and had not regularly
visited or maintained significant contacts with D.H. On cross-examination, Brewster
noted that Holloway had previously called DFPS regarding Toliver’s treatment of
D.H. in an effort “to take D.H. out of a dangerous situation.” 
          Holloway, who was currently incarcerated, testified that he had received
special training to care for D.H. and that he was present at D.H.’s birth. Holloway
had been concerned about Toliver’s treatment of D.H. and had called DFPS on
multiple occasions. On one occasion, DFPS removed D.H. and placed him with
Holloway, but then returned D.H. to Toliver. Holloway also contacted DFPS with
concerns that D.H. was not dressed properly, and stated that he had tried to remove
D.H. from a “dangerous situation.” While incarcerated, Holloway enrolled in the
“Mineral Wells Pre-parole program,” and had signed up for electrician and carpentry
classes. Holloway explained that he had received probation for robbery, but that his
probation had been revoked in November 2004 because he tested positive for cocaine. 
After the mediation with DFPS, he was to be considered for placement, but DFPS
never performed a home study. Holloway stated that he loves his son very much, and
that he had signed papers giving permanent managing conservatorship to his mother
so that the children could stay together. 
Martin 
          Brewster testified that although Martin is “an alleged father,” Martin never
visited Z.M. during the case and Martin never contacted her to arrange a visit. 
Brewster also stated that she had never seen Martin until he appeared at trial, that
Martin had been served but did not timely file an admission of paternity, and that
Martin had not paid any child support. The parties stipulated that Martin had a
criminal record. On cross-examination, Brewster agreed that Martin was not a party
to the mediated settlement agreement. 
          Martin testified that although he had never been adjudicated the father of Z.M.,
he was in fact Z.M’s father. Martin stated he had been involved with Z.M. for most
of Z.M.’s life, that when he got out of prison in 2006, he had “been there,” and that
for the “past like two years” and “about eight months prior to her being taken” he had
visited Z.M. “every weekend.” Martin had a good relationship with Z.M. and he
loves his daughter. He provided Z.M. with dolls and “dress up stuff.” DFPS never
contacted Martin after taking Z.M. into custody, and he did not contact DFPS because
he “didn’t know any contact numbers” and did not know he had the right to see Z.M. 
Martin stated that he had relatives who would be interested in raising Z.M., including
a sister and two cousins, and that his sister and cousins did not have a record with
DFPS or criminal histories. Martin explained that he first discovered that DFPS was
seeking to terminate his parental rights on January 31, 2006. Martin wanted all three
children to stay together, and he was willing to sign away conservatorship to Joseph. 
Martin stated that although he was currently incarcerated, he would be willing to
work and pay child support when he was released from prison. He explained that he
wanted to stay in Z.M.’s life. 
          On cross-examination, Martin admitted that he had several pending criminal
cases against him, including the offenses of unauthorized use of a motor-vehicle,
assault, and possession of marijuana. Martin also admitted that he had been in jail for
nine months since June 2000 and, during this time, he had no contact with Z.M. 
Martin had been in jail five or six times during the eight years of Z.M.’s life, and was
in prison from 1997 to 2000. Between September 2004 and June 2005, Martin visited
Z.M. every weekend at the home of Toliver’s niece. During this time, although
Martin knew that Z.M. was in DFPS’s custody, he never contacted DFPS.
The Trial Court’s Findings
          The trial court visited with D.H. in chambers and, at the conclusion of the trial,
orally ordered the parent-child relationship between appellants and the children
terminated. On March 3, 2006, the trial court signed an order terminating the parental
rights of appellants and appointing DFPS as the children’s sole managing
conservator. In its order, the trial court terminated Toliver’s parental rights based on
findings that she violated Texas Family Code section 161.001(1)(E), (F), (N), and
(O),


 and that termination was in the children’s best interest.


 The trial court
terminated Holloway’s parental rights based on findings that he violated section
161.001(1)(D), (F), (N), and (O),


 and that termination was in D.H.’s best interest.


 
In regard to Martin, the trial court terminated “any parental relationship” between
Martin and Z.M. “that may exist” based on findings that Martin, after being served,
did not timely file an admission or counterclaim of paternity


 and that termination
was in Z.M.’s best interest.


 Standard of Review 
           A parent’s right to “the companionship, care, custody, and management” of her
children is a constitutional interest “far more precious than any property right.” 
Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). The
United States Supreme Court has emphasized that “the interest of parents in the care,
custody, and control of their children—is perhaps the oldest of the fundamental
liberty interests recognized by this Court.” Troxel v. Granville, 530 U.S. 57, 65, 120
S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that
“this natural parental right” is “essential,” “a basic civil right of man,” and “far more
precious than property rights.” Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
Consequently, termination proceedings must be strictly scrutinized, and “involuntary
termination statutes are strictly construed in favor of the parent.” Id. 
          Because termination “is complete, final, irrevocable, and divests for all time
that natural right . . . the evidence in support of termination must be clear and
convincing before a court may involuntarily terminate a parent’s rights.” Id. (citing
Santosky, 455 U.S. at 747, 102 S. Ct. at 1391; Richardson v. Green, 677 S.W.2d 497,
500 (Tex. 1984)). Clear and convincing evidence is “the measure or degree of proof
that will produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.” Tex. Fam. Code Ann. § 101.007
(Vernon 2002); In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). Because termination
findings must be based upon clear and convincing evidence, not simply a
preponderance of the evidence, the Texas Supreme Court has held that the traditional
legal and factual standards of review are inadequate. In re J.F.C., 96 S.W.3d at
264–66. 
          Instead, in conducting a legal sufficiency review in a
termination-of-parental-rights case, we must determine whether the evidence, viewed
in the light most favorable to the finding, is such that the fact finder could reasonably
have formed a firm belief or conviction about the truth of the matter on which the
State bore the burden of proof. See id. at 266. In viewing the evidence in the light
most favorable to the judgment, we “must assume that the fact finder resolved
disputed facts in favor of its finding if a reasonable fact finder could [have done] so,”
and we “should disregard all evidence that a reasonable fact finder could have
disbelieved or found to have been incredible.” In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005) (citing In re J.F.C., 96 S.W.3d at 266). 
          In conducting a factual sufficiency review in a termination-of-parental-rights
case, we must determine whether, considering the entire record, including both
evidence supporting and evidence contradicting the finding, a fact finder reasonably
could have formed a firm conviction or belief about the truth of the matter on which
the State bore the burden of proof. In re J.F.C., 96 S.W.3d at 266; In re C.H., 89
S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence
is such that a reasonable fact finder could not have resolved the disputed evidence in
favor of its finding. In re J.F.C., 96 S.W.3d at 266–67. “If, in light of the entire
record, the disputed evidence that a reasonable fact finder could not have credited in
favor of the finding is so significant that a fact finder could not reasonably have
formed a firm belief or conviction, then the evidence is factually insufficient.” Id. at
266.Sufficiency of the EvidenceTermination of Toliver’s Parental Rights
          In her first issue, Toliver argues that the evidence is legally and factually
insufficient to support the trial court’s finding that she “engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endanger[ed] the physical or emotional well-being of the children” because “she did
not abuse illegal drugs around her children” and her “criminal activity is limited.” 
See Tex. Fam. Code Ann. § 161.001(1)(E) (Vernon Supp. 2005). In her sixth issue,
Toliver contends that the evidence is legally and factually insufficient to support the
trial court’s finding that termination of the parent-child relationship was in the
children’s best interest. See Tex. Fam. Code Ann. § 161.001(2). DFPS agrees that
although there is some evidence of assault and medical neglect, “the primary focus”
is Toliver’s narcotics use. DFPS argues that the “persistency of Toliver’s drug use
and her apparent inability or unwillingness” to complete treatment supports
termination of her parental rights. 
          In proceedings to terminate the parent-child relationship brought under Texas
Family Code section 161.001, DFPS must establish, by clear and convincing
evidence, one or more of the acts or omissions enumerated under subsection (1) of
section 161.001 and that termination is in the best interest of the child. Tex. Fam.
Code Ann. § 161.001 (Vernon Supp. 2005). Both elements must be established, and
termination may not be based solely on the best interest of the child as determined by
the trier of fact. Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987). 
          Endangerment
          The trial court, in ordering the termination of Toliver’s parental rights,
expressly found that Toliver “engaged in conduct or knowingly placed the children
with persons who engaged in conduct which endanger[ed] the physical or emotional
well-being of the children.” Tex. Fam. Code Ann. § 161.001(1)(E). “Endanger”
means to expose to loss or injury or to jeopardize. Boyd, 727 S.W.2d at 533. 
Although such endangerment requires more than a threat of metaphysical injury or
the possible ill effects of a less-than-ideal family environment, it is not necessary that
the conduct be directed at the child or that the child actually suffer injury. In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). To determine
whether termination is necessary, courts may look to parental conduct occurring both
before and after the child’s birth. In re D.M., 58 S.W.3d 801, 812 (Tex. App.—Fort
Worth 2001, no pet.). Moreover, the specific danger to the child’s well-being may
be inferred from parental misconduct standing alone. Boyd, 727 S.W.2d at 533; In
re R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). 
          Narcotics use, in some circumstances, may give rise to termination under
section 161.001(1)(E). Robinson v. Tex. Dep’t of Protective & Regulatory Servs., 89
S.W.3d 679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Evidence of
narcotics use and its effect on a parent’s life and her ability to parent may establish
that the parent has engaged in an “endangering course of conduct.” See In re R.W.,
129 S.W.3d at 739. For example, in Robinson, a mother was arrested for the offense
of possession of cocaine and placed on community supervision for three years. 89
S.W.3d at 682. The mother signed a family service plan, agreeing to avoid criminal
activity and submit to narcotics testing. Id. After the mother tested positive for
cocaine, the district court revoked the mother’s community supervision. Id. This
Court concluded “that appellant’s illegal drug activity, a violation of community
supervision after agreeing not to commit such acts in the plan . . . , established clear
and convincing proof of voluntary, deliberate, and conscious conduct that endangered
the well-being of her children.” Id. at 686–87. 
          Similarly, in In re R.W., the evidence demonstrated that the parent “continually
struggled with alcohol and drug abuse throughout the years prior to [the child’s]
birth” and that the parent’s “substance abuse and/or mental instability was so
excessive that he required medical assistance or intervention.” 129 S.W.3d at 739.
The evidence concerning the parent’s substance abuse reflected “more than just
‘remote and isolated incidents.’” Id. at 741. Despite the parent’s testimony that he
had stopped abusing narcotics and alcohol, the jury was not required to ignore the
parent’s long history of dependency and destructive behavior. Id. Instead, the jury
was entitled to infer, based on this evidence and evidence that the parent failed to
appreciate the need for treatment, that the parent’s substance abuse and mental health
issues would continue and would further jeopardize the child’s well being. Id.           In this case, Leacroy testified that, before removing the children and filing its
original petition, DFPS attempted to get Tolivar substance abuse treatment based on
“several reports” that Toliver was “snorting cocaine” and using other narcotics. 
Toliver initially denied narcotics use and said that she did not need those services. 
Counselors had made home-based visits to conduct random urinalysis on Toliver on
two separate occasions, and Toliver refused those tests for fear of providing “a
positive sample.” On another visit, the counselor was told that Toliver continued “to
use mood altering chemicals.” When Toliver finally submitted to testing in August
2004, she tested positive for cocaine on four separate occasions.
          After DFPS was named managing conservator of the children in September
2004, Toliver signed a mediated settlement agreement, which required her to follow
all recommendations, including those made as a result of a narcotics evaluation. The
agreement also contained an order that Toliver take a urinalysis “today” and that
Toliver was required to “go inpatient” if her tests were positive. The agreement,
which included admonishments about noncompliance, informed Toliver that her
parental rights were in jeopardy.          
          DFPS also introduced into evidence numerous status hearing orders and
permanency plans. These reflected that, as early as October 2004, Toliver was
ordered to take urinalysis testing and to “go inpatient” if she tested positive. Toliver
was initially admitted to inpatient treatment at the ADA in November 2004. 
However, Toliver was quickly discharged seven days later because she threatened
other clients and staff members and exhibited hostile behaviors. ADA’s records
reflected that Toliver had no intention to complete the treatment objectives, but was
there only because of DFPS. 
          The February 11, 2005 permanency plan and permanency progress report
reflected that Toliver told DFPS that she was “too busy” to visit her children. 
Because of Toliver’s hostility toward the children’s relative care giver, DFPS
required Toliver to schedule any future visits at DFPS’s office. On February 17,
2005, the trial court again ordered Toliver to take a urinalysis. The May 12, 2005
permanency plan stated that after Toliver was discharged from inpatient treatment at
ADA due to her behavioral problems, DFPS located another inpatient program, but
Toliver refused to go. Instead, Toliver began outpatient treatment at GCC, but based
on positive test results for cocaine, she was discharged, again with a recommendation
that she go to inpatient treatment. Again, Toliver failed to go to inpatient treatment. 
          The report further noted that on March 25, 2005, when Toliver met with her
children, she was “extremely anxious and agitated as well as highly emotional,” that
she appeared to be “high,” and that she was warned to calm down or her visit would
be terminated. Toliver tested positive for cocaine five days later. This appears to be
either the last or one of the last visits Toliver had with her children. Finally, the
report stated that it was unlikely that Toliver would make significant changes and that
Toliver had been aggressive with a counselor during at least one session, so much so
that the counselor feared that Toliver would become “violent.” The report concluded
that there was no progress because Toliver continued to use narcotics and that Toliver
was unable to maintain a safe and stable home for her children. 
          The May 27, 2005 permanency hearing order reiterated that Toliver had not
demonstrated adequate compliance with the service plan, and the trial court, yet
again, ordered Toliver “to go inpatient.” The trial court expressly stated that if
Toliver did “not successfully complete rehab,” her case would “go to termination.” 
Although Toliver did complete inpatient treatment, shortly thereafter, on August 8
and 11, 2005, Toliver again tested positive for cocaine and PCP and reported daily
use of alcohol. Toliver subsequently “became hostile,” was “unwilling to work on
her accountability,” and “was unable to complete” the program because she “became
combative, threatening and cruel” and “present[ed] a threat to group safety.” 
          Finally, at a “crisis team intervention,” despite GCC’s and DFPS’s attempts to
explore “other options for treatment,” Toliver stated that “she would not return to
residential treatment” and did not want GCC services. Although DFPS informed
Toliver that she was not given permission to leave treatment, Toliver stated that she
was moving to Houston that night. GCC discharged Toliver, noting that she refused
“to own [up to her] use of PCP and appeared irritated and indigent at being drug
tested.” Toliver never contacted Brewster again.  
          This evidence supports a finding that Toliver engaged in substantial and long
term narcotics abuse, both before and after DFPS became involved in the case and
was named managing conservator. Evidence of Toliver’s narcotics use is even more
significant when considered with evidence that D.H. is fragile, needs constant
supervision, and has highly specialized medical needs, as well as evidence that Z.M.
has rages and outbursts, presents behavioral problems, and poses a threat to D.H.’s
safety if not properly supervised by her care takers. Additionally, Toliver continued
her use of narcotics even after knowing that her parental relationship with her
children was in jeopardy. See Robinson, 89 S.W.3d at 687 (stating that “appellant
knew her parental rights were in jeopardy when she continued her illegal drug use”
and finding fact that appellant testified that her drug problem ceased before trial “did
not controvert evidence that appellant’s illegal drug activity has been going on for 20
years”); In re J.N.R., 982 S.W.2d 137, 142 (Tex. App.—Houston [1st Dist.] 1998, no
pet.) (considering conduct jeopardizing parental rights as part of course of conduct
endangering well-being of child). The record is clear that from September 2003 to
February 2006, DFPS and the trial court sought to get Toliver substance-abuse
treatment, Toliver made little effort to complete treatment, and her treatment was
ultimately unsuccessful.
          Toliver’s assertion that there is no evidence that she abused narcotics around
her children is contradicted in the record. Toliver testified that she was the children’s
primary care giver. It also appears that the children’s fathers, who were not married
to Toliver and who were incarcerated for significant periods of time during the lives
of the children and the pendency of the case, never provided supervision for the
children in any meaningful way. Moreover, notes contained in a progress report,
which were introduced into evidence, reflect that Toliver appeared “high” during one
of her supervised visits with her children and that she had to be warned to stop her
improper behavior or her visit would end. Toliver tested positive for narcotics shortly
after this visit. Based on the specific facts presented in this case, we conclude that
a fact finder could reasonably have formed a firm conviction or belief that Toliver,
through her continued use of narcotics, engaged in conduct which endangered the
physical and emotional well-being of her children. Accordingly, we hold that the
evidence is legally sufficient to support the trial court’s finding under section
161.001(1)(E). 
          In regard to the factual sufficiency review, Toliver testified that she went to
inpatient treatment for thirty days and that the last time she used narcotics was when
she left treatment in Galveston. However, after completing her inpatient treatment,
Toliver almost immediately tested positive for narcotics, was discharged from her
outpatient treatment for severe behavioral problems, and then refused other treatment
options. At her crisis intervention meeting, Toliver notified DFPS that she was
moving to Houston and disregarded DFPS’s instructions that she could not leave
treatment and would need to seek treatment in Houston. After moving, Toliver did
not seek substance abuse treatment, did not receive another narcotics test, and did not
contact DFPS. Additionally, even Toliver testified that she still needed time to get
herself together and to “make sure she [could] stay clean.” In fact, Toliver did not
even request that the children be placed back in her home. Considering both evidence
supporting and contradicting the trial court’s findings, we conclude that a fact finder
could reasonably have formed a firm conviction or belief that there was sufficient
evidence that Toliver engaged in conduct which endangered the physical and
emotional well-being of her children. We hold that the evidence is factually
sufficient to support the trial court’s finding under section 161.001(1)(E).
          We overrule Toliver’s first issue. Having held that the evidence is legally and
factually sufficient to support the trial court’s finding under section 161.001(1)(E),
we need not address Toliver’s second, third, fourth, and fifth issues, in which she
contends that the evidence is legally and factually insufficient to support the trial
court’s findings under sections 161.001(1) (F), (N), and (O).
          Best Interest
          In determining whether termination was in the children’s best interest, we may
consider several factors, including (1) the child’s desires, (2) the current and future
physical and emotional needs of the child, (3) the current and future physical danger
to the child, (4) the parental abilities of the person seeking custody, (5) whether
programs are available to assist the person seeking custody in promoting the best
interests of the child, (6) plans for the child by the person seeking custody, (7) the
stability of the home, (8) acts or omissions of the parent that may indicate that the
parent-child relationship is not proper, and (9) any excuse for acts or omissions of the
parent. Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); In re L.M., 104
S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The burden is on
DFPS to rebut the presumption that the best interest of the child is served by keeping
custody in the natural parents. In re K.C.M., 4 S.W.3d 392, 395 (Tex.
App.—Houston [1st Dist.] 1999, pet. denied). The Holley factors are not exhaustive,
and there is no requirement that DFPS prove all factors as a condition precedent to
parental termination. See In re C.H., 89 S.W.3d at 27. 
          Although the trial court spoke with D.H., there is no evidence in the record
concerning any of the children’s desires. However, ample testimony was presented
concerning D.H.’s and Z.M’s special needs. The evidence also shows that D.H. was
receiving specialized medical care that he had not received with Toliver. 
Furthermore, the foster family intended to adopt both D.H. and A.R., and the foster
family was also willing to keep Z.M. in their home as a foster child to see if they
could meet Z.M.’s needs while providing a safe environment for D.H. At trial, the
foster family was still considering adopting Z.M. 
          In contrast, Toliver indicated that she was not in a position for the children to
be returned to her. In fact, Toliver had not seen her children since Easter 2005 and
had not been in contact with DFPS since being discharged from GCC and moving to
Houston. Toliver also had not been tested for narcotics since leaving treatment and
had not sought any treatment in Houston, despite DFPS’s instructions that she was
required to do so. Although Joseph, D.H.’s grandmother, stated that it would be “a
wonderful idea” for her to take all three children, she did not provide any details as
to how she planned on providing for all three children. She also did not have any
detailed plans on how she would transport D.H. to TCH to receive his treatments. 
          In addition to the above evidence, the trial court also could have considered the
evidence supporting its finding that Toliver’s frequent and long-term use of narcotics
endangered the children’s welfare. Toliver was repeatedly ordered by the trial court
to “go inpatient,” but refused to do so, even with the knowledge that her parental
rights were in jeopardy. After Toliver finally completed an inpatient treatment
program, she tested positive for cocaine almost immediately during her follow-up
treatment. She was discharged from group treatment after exhibiting severe
behavioral problems, and then left treatment altogether. Toliver never successfully
completed a rehabilitation program to address her long term narcotics abuse. 
          From these facts, a fact finder could have formed a firm conviction or belief
that termination of Toliver’s parental rights was in the children’s best interest. 
Accordingly, we hold that the evidence is legally and factually sufficient to support
the trial court’s finding that termination of Toliver’s parental rights was in the
children’s best interest. 
          We overrule Toliver’s sixth issue.
Termination of Holloway’s Parental Rights
          In his first issue, Holloway contends only that the evidence is legally and
factually insufficient to support the trial court’s finding that “he knowingly placed or
knowingly allowed [D.H.] to remain in conditions or surroundings which endangered
the physical or emotional well-being of [D.H.].” See Tex. Fam. Code Ann. §
161.001(1)(D). In his third issue, Holloway contends that the evidence is legally and
factually insufficient to support the trial court’s finding that termination of the parent-child relationship between him and D.H. was in D.H.’s best interest. See Tex. Fam.
Code Ann. § 161.001(2). 
          Findings under section 161.001(1)
          As noted above, in proceedings to terminate the parent-child relationship
brought under Texas Family Code section 161.001, DFPS must establish, by clear and
convincing evidence, one or more of the acts or omissions enumerated under
subsection (1) of section 161.001 and that termination is in the best interest of the
child. Tex. Fam. Code Ann. § 161.001; Boyd, 727 S.W.2d at 533. Only one
predicate finding under section 161.001(1) is necessary to support termination. In re
A.V., 113 S.W.3d 355, 362 (Tex. 2003).
          Here, the trial court, in its order terminating Holloway’s parental rights, found
that Holloway violated section 161.001(1)(D). Tex. Fam. Code Ann. §
161.001(1)(D). However, the trial court also found that Holloway had violated
subsections (F), (N), and (O) of section 161.001(1). Holloway does not challenge the
sufficiency of the evidence supporting the findings under section 161.001(1)(F), (N),
and (O), and thus he waives any complaint about the sufficiency of the evidence to
support these findings.


 Because only one predicate finding under section
161.001(1) is necessary to support termination, we need not address Holloway’s first
issue, which solely relates to the trial court’s finding under section 161.001(1)(D).
          Best interest
          In regard to the best interest finding, Holloway asserts that his mother, Joseph,
had requested that all three children be placed in her home, which would allow all
three children to stay together. Holloway also notes that he received specialized
training to care for D.H. and that he had made “at least three affirmative actions” to
remove D.H. from Toliver’s care. 
          Again, in determining whether termination of Holloway’s parental rights was
in D.H.’s best interest, we consider a number of factors, including the child’s desires, 
the current and future physical and emotional needs of the child, the current and
future physical danger to the child, the parental abilities of the person seeking
custody, whether programs are available to assist the person seeking custody in
promoting the best interests of the child, plans for the child by the person seeking
custody, the stability of the home, acts or omissions of the parent that may indicate
that the parent-child relationship is not proper, and any excuse for acts or omissions
of the parent. Holley, 544 S.W.2d at 371–72. The burden is on DFPS to rebut the
presumption that the best interest of the child is served by keeping custody in the
natural parents. In re K.C.M., 4 S.W.3d at 395. 
          In regard to the Holley factors, Faught, D.H.’s foster mother, testified that she
and her husband intended to adopt both D.H. and A.R. and that her family was still
considering adopting Z.M. Faught stated that they were willing to keep Z.M. in their
home as a foster child to see if they could meet Z.M.’s needs while providing a safe
environment for D.H. D.H.’s foster family provided him with proper medical care,
and D.H. was receiving specialized medical care for his brittle bone condition,
something he had not been receiving beforehand. Faught testified that she had
numerous people, many who were therapists, in her household during the day to help
care for her foster children. Faught stated that she and her husband had bonded with
D.H. and that her husband and D.H. were “very close.” She also stated that D.H. was
involved in a special baseball league.
          In contrast, although Holloway’s mother indicated that it would be “a
wonderful idea” for her to care for D.H. and D.H.’s siblings, she did not provide any
details as to how she planned on providing for all three children. Joseph lived in a
one-bedroom apartment with assistance from the county, though she thought she
could get a bigger apartment with additional county assistance. Joseph, who admitted
that she was currently unable to work because of an injury, appeared to agree that she
would need help in caring for the children. However, both of Joseph’s daughters had
a history with DFPS, and would not be helping her. Joseph did not provide detailed
testimony on who else would help her. Additionally, Holloway, who testified that he
had received training to care for D.H., was incarcerated. Joseph’s testimony left
doubt as to whether she and her family would be able to care for the children and
whether they would be able to transport D.H. to TCH to receive the bone fusion
treatment that he was currently receiving with his foster family. Holloway’s and
Joseph’s testimony also indicates that they had not given any thought to major safety
issues identified by the foster family, i.e., the impact of Z.M.’s behavioral problems
on D.H.’s physical safety. A fact finder could reasonably have concluded that had
D.H. been placed with Joseph, he would have again ended up “bouncing” between
various family members for the rest of his life, would not have received proper care,
and would have been in an unsafe environment.    
           We recognize that Holloway stated that he loves his son very much, and that
he had signed papers giving permanent managing conservatorship to his mother
because he would “rather put him with a family member” so that the children could
stay together. Holloway also said that Joseph had been fair to him growing up and,
in response to DFPS noting that both of Joseph’s daughters had their children taken
away by DFPS and that Holloway was incarcerated, Holloway stated that none of that
was her fault. 
          However, from these facts, we conclude that a fact finder could reasonably
have formed a firm conviction or belief that termination of Holloway’s parental rights
was in D.H.’s best interest. Accordingly, we hold that the evidence is legally and
factually sufficient to support the trial court’s finding that termination of Holloway’s
parental rights was in D.H.’s best interest. 
          We overrule Holloway’s third issue.
Termination of Martin’s Parental Rights
          In his second issue, Martin argues that the trial court erred in terminating his
parental rights to Z.M. on the basis that he did not timely file an admission of
paternity after being served because he appeared at trial, asserted his paternity, and
requested that his parental rights not be terminated. See Tex. Fam. Code Ann. §
161.002(b)(1). He asserts that DFPS should have been required to seek termination
on other grounds in section 161.001(1). DFPS responds that Martin’s testimony was
not timely and that Martin was required to file “some kind of document” to admit his
paternity in accordance with the statute.
           Section 161.002 provides:
          The rights of an alleged father may be terminated if:
 
          (1)     after being served with citation, he does not respond by
timely filing an admission of paternity or a counterclaim
for paternity under Chapter 160.
 
Id. Subsection (b)(1) allows a trial court to “summarily terminate” the rights of an
alleged biological father who does not assert his paternity by filing an admission of
paternity or a counterclaim for paternity. Id.; see Phillips v. Tex. Dep’t of Protective
& Regulatory Servs., 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.). 
However, by filing an admission or counterclaim for paternity, the alleged father is
given the right to require the State to prove by clear and convincing evidence that he
engaged in one of the types of conduct listed in section 161.001(1) and that
termination is in the best interest of the child. Phillips, 25 S.W.3d at 357.
          Here, the trial court terminated “any parental relationship” between Martin and
Z.M. “that may exist” based on findings that Martin, after being served with citation,
did not respond by timely filing an admission of paternity or a counterclaim of
paternity. See Tex. Fam. Code Ann. § 161.002(b)(1). Martin never formally filed
a document with the trial court admitting his paternity. Martin also did not appear for
mediation, and the settlement agreement stated that he was “never adjudicated the
legal father.” However, Martin appeared at trial and stated that he was Z.M’s father. 
Martin further stated that he had been involved with Z.M. for most of her life and that
he loved her. Martin had not previously contacted DFPS because he “didn’t know
any contact numbers” and did not know he had the right to contact Z.M. 
          Our sister courts have addressed somewhat similar issues. For example, In In
re K.W., the Texas Department of Protective and Regulatory Services (“TDPRS”) 
served a petition seeking termination of parental rights on a father who was
incarcerated. 138 S.W.3d 420, 429 (Tex. App.—Fort Worth 2004, pet. denied). The
following month, the father wrote letters to TDPRS and the court stating that he was
the child’s biological father and that he was not giving up his parental rights. Id. The
court held that the father’s letters constituted “admissions of paternity sufficient to
put TDPRS and the trial court on notice that [the father] admitted his paternity and
wanted to oppose termination of any rights he might have with respect to [the child]”
and thus there was no evidence to support the trial court’s finding under section
161.002(b)(1). Id. at 431.
          Similarly, in Estes v. Dallas County Child Welfare Unit of Texas Department
of Human Services, which was decided under a former but substantively similar
statute, the State filed a petition to terminate the parental rights of a father who was
in prison. 773 S.W.2d 800, 801 (Tex. App.—Dallas 1989, writ denied). Two weeks
before the final termination hearing, the father filed a pro se answer, alleging that he
was an indigent parent and requesting the appointment of an attorney. Id. The court
stated that “[t]here is no provision in the Texas Family Code that specifies any
particular form or language required for an admission of paternity.” Id. The court
noted that “the natural rights existing between a parent and child are of constitutional
dimensions” and that “involuntary termination proceedings must be strictly
scrutinized.” Id. at 802 (citing Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985)). The
court, applying strict scrutiny, stated that the father’s answer constituted an admission
of paternity and that the answer “was timely filed since it was filed prior to the final
hearing in the suit for termination.” Id.; see also In re D.D.S., No. 2-05-00313-CV,
2006 WL 2309813, at *2 (Tex. App.—Fort Worth Aug. 10, 2006, no pet.) (“This
court has held that there are no formalities that must be observed for an admission of
paternity to be effective; for example, an admission of paternity in letters written to
the trial court will suffice.”).
          Section 161.002 prescribes the filing of an admission of paternity, but there is
no reference in the statute to any formalities that must be observed when “filing” such
an admission. Here, although Martin did not file a document with the court clerk, he
appeared at trial prior to the trial court’s termination of his parental rights,
unequivocally asserted that he was Z.M.’s father, and requested that his parental
rights not be terminated. Applying strict scrutiny to this termination statute, as we are
required to do, we hold that Martin, by appearing at trial before his rights were
terminated and admitting that he was in fact Z.M.’s father, triggered his right to
require DFPS to prove that he engaged in one of the types of conduct listed in section
161.001(1) before his parental rights could be terminated. Accordingly, we further
hold that the trial court erred in finding that Martin did not timely file an admission
of paternity and in terminating his parental rights to Z.M.
          We sustain Martin’s second issue. Having sustained Martin’s second issue, we
need not address his first issue in which he contends that the evidence is legally and
factually insufficient to support the trial court’s findings that termination of the
parent-child relationship between Martin and Z.M. was in Z.M.’s best interest.
 
 
Conclusion
          We affirm that portion of the order terminating the parental rights of Toliver
in regard to D.H., Z.M., and A.R. We also affirm that portion of the order terminating
the parental rights of Holloway in regard to D.H. However, we reverse that portion
of the order terminating the parental rights of Martin in regard to Z.M., and remand
the cause to the trial court for proceedings consistent with this opinion. 
 
 
     Terry Jennings
     Justice

Panel consists of Justices Nuchia, Jennings, and Higley.